# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤

*for the*

# 𝕋𝕙𝕚𝕣𝕕 ℂ𝕚𝕣𝕔𝕦𝕚𝕥

Case No. 21-2895

IN RE: NIASPAN ANTITRUST LITIGATION A.G.C. BUILDING TRADES
WELFARE PLAN; CITY OF PROVIDENCE, RHODE ISLAND;
ELECTRICAL WORKERS 242 AND 294 HEALTH & WELFARE FUND;
INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 49
HEALTH AND WELFARE FUND; INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 132 HEALTH AND WELFARE FUND;
NEW ENGLAND ELECTRICAL WORKERS BENEFITS FUND; PAINTERS
DISTRICT COUNCIL NO. 30 HEALTH & WELFARE FUND; UNITED FOOD
& COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING
EMPLOYERS HEALTH AND WELFARE FUND; MILES WALLIS;
CAROL PRASSE,

*Appellants.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## REPLY BRIEF FOR APPELLANTS

HYLAND HUNT
RUTHANNE M. DEUTSCH
ALEXANDRA P. MANSBACH
DEUTSCH HUNT PLLC
300 New Jersey Avenue NW,
   Suite 900
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com
rdeutsch@deutschhunt.com
lmansbach@deutschhunt.com

KENNETH A. WEXLER
JUSTIN N. BOLEY
WEXLER BOLEY & ELGERSMA LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com

*Attorneys for Appellants*

*(For Continuation of Appearances See Inside Cover)*

MICHAEL M. BUCHMAN
MOTLEY RICE
777 Third Avenue, 27th Floor
New York, New York 10017
(212) 577-0040
mbuchman@motleyrice.com

STEVE D. SHADOWEN
RICHARD M. BRUNELL
HILLIARD SHADOWEN
1135 West Sixth Street, Suite 125
Austin, Texas 78703
(202) 600-9640
rbrunell@hilliardshadowenlaw.com
steve@hilliardshadowenlaw.com

SHARON K. ROBERTSON
COHEN MILSTEIN SELLERS
    & TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
srobertson@cohenmilstein.com

MARVIN A. MILLER
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
(312) 332-3400
mmiller@millerlawllc.com

*Attorneys for Appellants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................3

I.    PLAINTIFFS HAVE MORE THAN SATISFIED CIRCUIT PRECEDENT BY SHOWING A FEASIBLE MEANS EXISTS TO IDENTIFY CLASS MEMBERS FROM RELIABLE RECORDS. ..............................................3

II.   PBM DATA IS AT WORST MINIMALLY OVER-INCLUSIVE. ...............5

III.  CLASS MEMBERS CAN BE IDENTIFIED WITHOUT EXTENSIVE INDIVIDUALIZED FACT-FINDING. ...........................................11

  A.  The District Court's Several Legal Errors Require Reversal. ..........................11

  B.  Plaintiffs' Programmatic Method Can Identify Class Members with Minimal Individual Inquiry. ..................................14

  C.  The Conflict with Other District Court Decisions Confirms the District Court's Errors.................................................23

IV.   THE POLICIES UNDERLYING THE CLASS ACTION PROCEDURE FAVOR ASCERTAINABILITY HERE.....................................25

  A.  This Class Poses No Risk to Defendants' Due Process Rights. .......................25

  B.  As (Wrongly) Applied by the District Court, the Ascertainability Doctrine Impermissibly Impedes the Class Mechanism.................................26

  C.  Reconsideration of the Court's Ascertainability Standards Is Unnecessary, but Preserved for En Banc Review. .......................................27

CONCLUSION .................................................................................28

COMBINED CERTIFICATE OF COMPLIANCE ...............................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................27

*Bagot v. Ashcroft*,
    398 F.3d 252 (3d Cir. 2005) .............................................23

*Byrd v. Aaron's, Inc.*,
    784 F.3d 154 (3d Cir. 2015) ....................................*passim*

*City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*,
    867 F.3d 434 (3d Cir. 2017) ...................................*passim*

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) ...............................20, 25, 26

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D.N.J. 2004)...................................16

*Hargrove v. Sleepy's LLC*,
    974 F.3d 467 (3d Cir. 2020) .................................. *passim*

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    No. 1:15-cv-6549 (CM) (RWL), 2020 U.S. Dist. LEXIS 247078
    (S.D.N.Y. Dec. 18, 2020) .......................................24

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
    338 F.R.D. 294 (D. Mass. 2021)................................ 24, 25

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    299 F.R.D. 555 (E.D. Tenn. 2014) ...............................24

*In re Wellbutrin XL Antitrust Litig.*,
    308 F.R.D. 134 (E.D. Pa. 2015)................................24

*In re Zetia Ezetimibe Antitrust Litig.,*
No. 2:18-md-2836, 2020 U.S. Dist. LEXIS 183601
(E.D. Va. Aug. 13, 2020) .............................................................. 24, 25

*Marcus v. BMW of N. Am., LLC,*
687 F.3d 583 (3d Cir. 2012) .............................................................22

*Reyes v. Netdeposit, LLC,*
802 F.3d 469 (3d Cir. 2015) ........................................... 11, 12, 13, 17

*Teleglobe Communs. Corp. v. BCE, Inc.,*
493 F.3d 345 (3d Cir. 2007) .............................................................10

*United States v. Chrzanowski,*
502 F.2d 573 (3d Cir. 1974) .............................................................16

*Vista Healthplan, Inc. v. Celphalon, Inc.,*
No. 2:06-cv-1833, 2015 U.S. Dist. LEXIS 74846
(E.D. Pa. June 10, 2015) .................................................................24

# INTRODUCTION

The digital paper trail that identifies end payors for prescription drug transactions, including Niaspan transactions, is both reliable and extremely valuable. Data is kept, bought and sold, and analyzed for commercial purposes every day. Defendants ignore this reality, flyspecking individual transaction records and overstating complexity for a tiny corner of this data universe, missing the forest for the trees: No "mini-trial" is required to verify end-payor class members. *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 170 (3d Cir. 2015). Reliable records, combined in those rare cases necessary with readily corroborated affidavits, amply meet this Court's ascertainability standards.

In refusing to find ascertainability here, the district court applied the wrong standards, requiring less than *de minimis* over-inclusiveness and permitting no individual inquiry at all, contrary to this Court's precedents. While Defendants attempt to cloak the district court's erroneous legal holdings as protected factual findings, that should not distract from the largely undisputed facts here: Every prescription drug transaction has an electronic record. Pharmacy Benefit Managers can produce these records and identify the end payors that are their clients, accounting for the bulk of the class. For the remaining small subset of class members that are not PBM clients, Defendants acknowledge that PBMs can identify some of them, and the record shows that PBMs collect the necessary information to identify

all of them. Plaintiffs' expert Craft provided a comprehensive—not "shifting"—programmatic methodology to identify class members, with corroborated affidavits as a backstop.

The district court credited Craft's opinions that PBMs can identify government plans (over Defendants' objection, not renewed here). It nonetheless rejected Craft's similar opinions for employment-based plans. Defendants attempt to shield this mismatched result behind "clear error" review, coupled with much hand-waving about waiver. But the factual findings they defend were never made—and could not be made on this record—while the legal issues were sufficiently aired.

Defendants attack the record by pointing to hypothetical questions that might arise at the margins of a comprehensive dataset, not meaningful problems. And their argument proceeds as if the efficiency of Defendants' challenges to class membership is the only value at stake. Yet denying Plaintiffs the ability to pursue claims in an efficient manner—despite reams of available data about each prescription drug transaction—effectively denies them the ability to bring any claims at all, removing an important deterrent to anti-competitive behavior. The risk here is not to Defendants' due process rights, but to achieving full redress for injured class members.

Ultimately, Defendants are asking for a new carve-out from this Court's already outlying ascertainability doctrine based on size—number of transactions,

class members, inquiries, or whatever gets them by. Under that approach, the more people who are hurt, the less likely they can pursue a remedy. The "ascertainability" gloss on Rule 23's requirements does not require such a drastic result.

## ARGUMENT

## I.    PLAINTIFFS HAVE MORE THAN SATISFIED CIRCUIT PRECEDENT BY SHOWING A FEASIBLE MEANS EXISTS TO IDENTIFY CLASS MEMBERS FROM RELIABLE RECORDS.

Defendants begrudgingly agree that plaintiffs "need not be able to identify all class members at class certification—instead, [they] need only show that class members can be identified." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020) (internal quotation marks omitted); *see* Resp. Br. 21. But like the district court, Defendants err by being "too exacting," *id.* at 470. Plaintiffs need not identify every class member, they need only provide some "evidentiary support," beyond "mere[] … assurances," that class members can be identified "without extensive and individualized fact-finding or 'mini-trials.'" *Byrd*, 784 F.3d at 163-64. A comparison to *Byrd* and *Hargrove* shows that Plaintiffs have met this Circuit's standards. *See* Op. Br. 29-35.

In *Byrd*, the plaintiffs neither identified nor obtained records with names of household members, but simply proposed to use an (unspecified) form affidavit and match addresses with (unspecified) public records. *See* 784 F.3d at 169-71. That was good enough. In *Hargrove*, the plaintiffs produced "samples of … documents for six

3

proposed class members," together with affidavits. 974 F.3d at 472-73. That was sufficient to show that the entire class could be identified, even though "the records … [were] incomplete." *Id.* at 480. In neither case did the plaintiffs submit expert evidence with a methodology for identifying class members, or a step-by-step manual for how every type of record could be parsed.

Although not required, Plaintiffs made that stronger showing here: declarations from PBMs that the records exist and can be used to identify end payors, A343-A352; PBM data for named Plaintiffs, evidencing their status as end payors, A989-A992; an additional sample of PBM data, A408-A411; and an expert methodology for identifying class members from that data, A241-A291, A998-A1025. That eclipses the evidence found sufficient in *Byrd* and *Hargrove*.

Defendants insist that something more than *Byrd* or *Hargrove* is needed here due to class size or purported complexity, Resp. Br. 26, 39-40, 44, but neither factor signifies. And Defendants overstate both by repeatedly invoking "millions" of transactions. But the correct inquiry concerns the number of class members; here, there are, at most, "tens of thousands," *see* Resp. Br. 11. The Court has already countenanced ascertainability even if affidavits were needed from tens of thousands of potential class members. *Compare City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 442 & n.5 (3d Cir. 2017) (up to 31,000 dealerships), *with* A55 (describing Defendants' estimate of 24,000 end payor health plans). And here,

the number that matters is even less. Per Defendants' expert, there are only about 1,300 insurance companies, A598 (Hughes ¶33), and insurers are the only entities that can even possibly generate confusion by playing roles as both end-payor class members and non-member administrators.

Ultimately, whether an entity paid for Niaspan is just as straightforward a question as whether an individual lives at an address (as in *Byrd*, 784 F.3d at 169) or whether a dealership received a fax (as in *City Select*, 867 F.3d at 442). With that kind of one-off inquiry, this Court has already held that "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification." *Byrd*, 784 F.3d at 171. Plaintiffs more than met the ascertainability standards applied in *Byrd*, *City Select*, and *Hargrove*, and there is no reason to jettison those standards here.

## II.    PBM DATA IS AT WORST MINIMALLY OVER-INCLUSIVE.

When this Court's standards are properly applied, Defendants' attempts to turn minor peripheral issues into showstoppers all fail. The problem Defendants identify—PBM data that includes non-class members—is either nonexistent or vanishingly small. Because only a "high degree of over-inclusiveness could prevent certification," *City Select*, 867 F.3d at 442 n.4, the district court got it wrong.

PBM data can be considered "over-inclusive" to the extent that it includes some PBM clients that are not class members—an uncommon occurrence. Op. Br.

16-19. Such rarity weighs heavily in favor of ascertainability. PBM data is minimally "over-inclusive" at worst, if at all, and the district court committed plain legal error in holding Plaintiffs to a "de minimis" standard.

**1.** PBMs can identify end payors when they produce the data, and such a dataset is not over-inclusive at all. *See* Op. Br. 16-17, 19-20. PBMs so averred, A343-A361; Craft so testified, A816; Defendants' expert (Dietz) agrees that PBMs seek this information, A982; and a PBM produced a copy of a named Plaintiff's Niaspan transactions, identifying it by name, even though that named Plaintiff uses an administrator and has no direct relationship with the PBM, A989. Although Defendants assert that PBMs need not know the ultimate payor, Resp. Br. 30, Dietz opined that it was important for PBMs' "financial security" for them to know "are they dealing directly with someone responsible, or is it the responsible party down the road?" A982.

**2.** Even if PBMs did not identify end payors when they produce the data, their data—which all agree identifies their clients—is barely over-inclusive. The district was concerned that PBM data included non-class members (fully-insured plans and administrative intermediaries, A83), *i.e.*, it was over-inclusive. But the district court's assessment of how often that concern arises ("not *de minimis*," A83) was both legally flawed, and exactly backwards.

Defendants do not meaningfully dispute here that PBM clients are usually end

payors. Dietz's principal objection covers only those rare instances outside that norm. A459-A460. And the record amply supports the rarity of Dietz's issue. For starters, non-parties Caremark, Prime Therapeutics, OptumRx, and Express Scripts, A343-A352, Supp.A9-Supp.A11—PBMs making up over 80% of the market, A252—averred under oath that PBMs have "readily accessible records, … by which third-party payors can be identified on every purchase that [the PBM] adjudicates on behalf of its third-party payor clients." A349 (Prime). Although Defendants quibble with these declarations' purported lack of detail, there is no dispute that "PBM data can be used to identify an end payor where the end payor happens to be the PBM's *client*," Resp. Br. 29. Far from a "limited proposition," *id.*, this is nearly the whole ballgame.

Eighty-eight percent of employment-related plans are fully-insured plans. Employer sponsors of only fully-insured plans are not PBM clients, *see* Op. Br. 16; A262-A263 (Craft Supplemental), so they will never be included in the readily-obtainable client data field. Defendants do not dispute this, and their experts agree. A594 (Hughes ¶¶24-25) (describing only self-insured plans as "hir[ing] … a PBM"); A458-A459 (Dietz).[1] So, for nearly 90% of employment-related plans that might be

---

[1] Defendants now claim that a fully-insured plan might pay premiums to an insurer that itself hires an administrative intermediary. Resp. Br. 8, 43. That was not Dietz's opinion. A459; *see* Op. Br. 18 n.6. Regardless, it does not change the fact that a fully-insured plan will not appear in the PBM client data.

involved in Niaspan transactions, A84—and the entirety of the class exclusion for fully-insured plans—there is no over-inclusion issue.

That leaves 12% of employment-related plans—the self-funded plans. There, PBM client data will include a mix of self-funded plan clients (class members) and administrative intermediaries (not class members). Simple math using Dietz's administrator prevalence estimate means that PBM client data is over-inclusive by no more than about 6%. *See* Op. Br. 19. But even 6% overstates the over-inclusivity, for two reasons: First, employment-related health coverage is only about half the transactions because of Medicare and other non-employment coverage. *See* Op. Br. 17-18.[2] Second, as Defendants recognize, "a single entity, like an insurance company, may be an end payor as to one transaction and an administrator as to another." Resp. Br. 23. If so, that entity is properly identified as a class member, and the data is not over-inclusive. Stated another way, PBM client data wrongly identifies an insurance company as a class member only if that company had zero transactions for which it operated as an insurer, as opposed to an administrator. Such slight overbreadth concerns cannot defeat ascertainability.

Take *Hargrove*. There, the putative class of full-time drivers was held

---

[2] There is no evidence that the OptumRx data is not representative or that Medicare plans involve administrative intermediaries (*contra* Resp. Br. 36 & n.11). The only evidence of administrators involves employment-related plans. *See, e.g.*, A594 (Hughes); A458 (Dietz Supplemental ¶28).

ascertainable because plaintiffs "produced evidence that could be used to identify which drivers worked … full time." 974 F.3d at 479. Despite the defendants' objections that certain drivers were not full-time, *id.* at 481, the Court held that a "class can still be ascertainable even if it may be slightly overbroad." *Id.*

**3.** Defendants respond (Br. 36-37) that even minimal over-inclusiveness bars ascertainability unless Plaintiffs can "ex ante" identify, without any individual inquiry, which transactions fall into the over-inclusive set. Not so. Any demand for "ex ante" identification flies in the face of *City Select*'s holding that "Rule 23 does not require an objective way of determining class membership at the certification stage." 867 F.3d at 441. There, the Court assumed the relevant database did not specify which of up to 31,000 dealerships received unsolicited faxes, and nonetheless held a class could be ascertainable even with no way to identify fax-receiving dealerships other than to ask each of them. *Id.* at 442. No "ex ante" method was offered to determine which dealerships had fax numbers but had *not* received faxes (the over-inclusive subset analogous to excluded plans or intermediaries here). The Court held that no "objective" method for winnowing down the data was required, *id.* at 441, and reiterated that even without "conclusive[]" records, only a "high degree of over-inclusiveness could prevent certification," *id.* at 442 n.4.

Here, Plaintiffs went further, showing how the records *do* provide an objective, "ex ante" way to identify which transactions fall within that small subset

involving intermediaries, *see* Section III.B, *infra*. Because the records are barely over-inclusive to start with, precedent independently favors ascertainability.

**4.** The lack of over-inclusiveness is properly before the Court (*contra* Resp. Br. 35). Plaintiffs stated that fully-insured plans would not be listed as PBM clients, thereby addressing the majority of plans, and the district court cited the 88% fully-insured statistic. *See* A84; Plaintiffs' Renewed Mot., Dkt. 722-1, at 13-14. Plaintiffs also argued that that the administrator concern was "mythical" and slight overbreadth did not defeat ascertainability. *See* Plaintiffs' Reply, Dkt. 751, at 8, 13-14. The parties thus joined issue on the degree of over-inclusiveness, "present[ing] it with sufficient specificity to allow the court to pass on it." *Teleglobe Communs. Corp. v. BCE, Inc.*, 493 F.3d 345, 376 (3d Cir. 2007); *cf. Hargrove*, 974 F.3d at 475 n.5 (declining to find forfeiture in appellate briefing where "the District Court expressly discussed and ruled on … [an] issue"). The proof is in the pudding because the district court passed on the issue, A83-A84, albeit in error.

**5.** Defendants do not dispute that it would be legal error to require less than de minimis over-inclusiveness. *See* Resp. Br. 46-47. Instead, they try to repackage the district court's statement about the prevalence of excluded entities ("not *de minimis*," A83) as solely a factual finding. But *de minimis* is a legal standard. If the district court had applied the correct legal standard, its opinion would reflect a judgment that PBM client data was over-inclusive to a "high degree." But the district

court made no such assessment, nor could it have on this record.

## III.   CLASS MEMBERS CAN BE IDENTIFIED WITHOUT EXTENSIVE INDIVIDUALIZED FACT-FINDING.

The district court's failure to properly evaluate over-inclusiveness is reason enough to reverse, but there is more: The district court applied an erroneous no-individual-inquiry standard. *See* Op. Br. 36-39. The district court compounded that legal error by myopically focusing on two examples to assess the reliability of the entire approach, and getting those two examples clearly wrong besides. *See* Op. Br. 42-44. The failure to even consider substantial portions of Plaintiffs' methodology, while judging a sliver of it against the wrong legal yardstick, constitutes abuse of discretion. The district court's legal analysis cannot be salvaged by inventing factual findings the district court never made, or by insisting that rote recitation of the correct standard suffices, without ever applying it.

### A.   The District Court's Several Legal Errors Require Reversal.

**1.** Defendants do not dispute that the correct legal standard bars ascertainability only when "extensive" individualized fact-finding is involved. *See* Resp. Br. 47. They instead claim that the district court applied the right standard by reciting it at the outset of the opinion. *See* A79. But recitation of the standard alone is not enough; it must be applied as well. In *Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3d Cir. 2015), the Court reversed a district court's denial of class certification, because even though the correct standard was mentioned, other statements in the

opinion showed the court still "misunderstood the burden of proof placed on a plaintiff seeking class certification." *Id.* at 484. The full opinion here likewise reveals a plain "depart[ure] from the standards … articulated" by the Third Circuit. *Id.*

The district court stated that Plaintiffs "must prove that identifying class members will not require 'individualized fact-finding,'" A87, and that they had "not shown they can identify, without individualized inquiry, the … class members," A89. Defendants claim these are no more than factual findings. Resp. Br. 47-48. But a statement about what plaintiffs "must prove," A87, is not a factual finding—it is a statement of the (wrong) legal standard. The district court's use of similar language in reciting what Plaintiffs had not proven (in its view) reinforces that the court applied that wrong standard. *Accord Reyes*, 802 F.3d at 485 (references to "absolute proof").

Worse still, the district court conflated individualized *fact-finding* with any individualized *inquiry*. *Compare* A87 ("without individualized fact-finding"), *with* A89 ("without individualized inquiry"); *see* Op. Br. 36-37. This no-individual-inquiry rule transgresses this Court's precedent that "[t]here will always be some level of inquiry required to verify that a person is a member of a class." *Byrd*, 784 F.3d at 170-71; *see also City Select*, 867 F.3d at 441.

**2.** The near-exclusive basis for the district court's conclusion that Plaintiffs

could not identify class members "without individualized fact-finding," A87, was its assessment that Craft erred in two of twenty-two examples, A86-A87. Focusing on only those examples to the exclusion of other evidence was an abuse of discretion. *See Reyes*, 802 F.3d at 494-95 (reversing certification denial that hinged on only "one piece of evidence").

Defendants insist that a mere two (alleged) errors allowed the district court to discount Craft's opinions "in full." Resp. Br. 32. But the district court never did that, instead finding Craft's methodology reliable for government plans, A82-A83. Still, the court refused to grapple with evidence that establishes that similar programmatic tools also work for the only other contested class exclusion.

As for whether the two examples even showed methodological errors, Defendants insist that their documents "from close in time to the transactions," were enough to raise questions. Resp. Br. 33. But their documents were either five to nine *years* after the transactions (not timely at all) or did not address prescription benefits specifically. *See* Op. Br. 43. Calling them "close in time" says nothing about their relevance to drug benefits. Declaring the entire methodology unreliable because of inapposite documents for two examples was an abuse of discretion.[3]

---

[3] The district court's slapdash analysis was no doubt affected by its refusal to hold a hearing. Yes, there was argument on the first motion, Resp. Br. 45, but no expert testimony was permitted. May 15, 2019 Hearing Tr., Dkt. 662, at 57. Courts that have held evidentiary hearings on Craft's methodology have universally recognized its feasibility and reliability. *See* Op. Br. 47.

**B.    Plaintiffs' Programmatic Method Can Identify Class Members with Minimal Individual Inquiry.**

The district court ignored substantial evidence showing how drug transactions are linked to end payors. The drumbeat of Defendants' response (Br. 17, 25, 36, 48) is that end payors cannot be identified without examining individual contracts. Market realities prove otherwise. Every day, millions of prescription drug transactions are completed in real-time using standardized data without anyone looking at a single contract. Each time, PBMs advance the right client's funds to the pharmacy, and if the PBM client is an administrator, the administrator advances the right end payor's funds to the PBM. This simple payment chain—at most two steps between end payor and pharmacy—is possible only because the identity of the end payor is embedded in the data. Op. Br. 13; *see also* Br. for Am. Antitrust Inst. at 12-17 ("AIA Br."). For all of Defendants' protestations, there is no denying that every moment of every day, prescription drugs are timely paid for, and the proper end payor regularly pays.

No one disputes that standardized National Council for Prescription Drug Programs (NCPDP) data has a combination of codes that reliably link each transaction to a particular end payor, whether an administrator is involved or not. *See, e.g.*, A977-A978 (Dietz Dep.) ("Q. So the group number needs to be transmitted from a PBM to an ASO in order for the ASO to know who to bill for a given transaction, correct? … [A.] It can vary with client to client or their setup structure,

14

but a group number … could be used by the ASO to determine whether… it's a self-funded client…or whether it's [] fully-insured…."). No one disputes that these codes are linked, in PBM data, to names, descriptions, and other information. *See* A1001-A1003 (Craft Reply); A542 (Dietz ¶48) (describing how NCPDP elements are linked to PBM data fields); A980 (Dietz Dep.).[4] There is further agreement that PBM data can be used to identify end payors that are PBM clients, Resp. Br. 29, and PBM data sometimes identifies end payors that use administrative intermediaries, Resp. Br. 30, A470 n.60 (Dietz Supplemental), A982 (Dietz Dep.).

The *only* dispute is how often PBM records alone (as opposed to PBM and administrator records combined) identify end payors in the small subset of cases involving administrative intermediaries.

**1.** Plaintiffs presented an "overalls, belt, and suspenders" methodology to show the administrative feasibility of answering this relatively small question. Op. Br. 26. This is a multi-layered methodology, not a "shifting" one (*contra* Resp. Br. 3, 12, 17, 23). The sole methodological shift (regarding Form 5500) occurred between Plaintiffs' first and second motions for class certification. But faulting Craft

---

[4] All thus agree that PBM data is broader than NCPDP data. From the start Craft made clear that her methodology drew on fields in the PBM claims data that linked to NCPDP data, like plan name and group description, not just the NCPDP data simpliciter. *See* A274 (giving example field names). There is no waiver related to "client account tables" (*contra* Resp. Br. 29).

for identifying a different method in the renewed motion, as both the district court and Defendants do, Resp. Br. 23-24; A84-A85, is inconsistent with this Court's rule that a renewed certification motion should be considered afresh, and not be subjected to a more stringent reconsideration standard. *Hargrove*, 974 F.3d at 477.

Nor is it impermissible method-shifting to respond to objections made by Defendants (*contra* Resp. Br. 24). Plaintiffs were explicitly permitted to "directly respond." A366. No Circuit rule "automatically exclude[s] anything an expert could have included in his or her original report." *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (discussing *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)).

**2.** At the first level of the methodology—the "overalls"—PBMs can identify most, if not all, end payors when they produce the data. *See* p. 6, *supra.*

Contrary to Defendants' attempts to rewrite history, Resp. Br. 27-28, the district court made no factual findings about this critical point. Despite recognizing that PBMs can identify government payors, A83, the court did not even mention this part of Craft's methodology in its analysis of the other exclusion, A84-A85. Defendants say the district court found that "NCPDP data does not include any fields … that reveal whether an entity is an end payor," Resp. Br. 28, but that is a non-sequitur. The issue is the scope of PBM data, which even Defendants' expert agrees includes more than NCPDP codes. *See, e.g.*, A542; A980.

Defendants next focus on alleged factual findings in pages where the district court reached a *legal* conclusion that Plaintiffs could not identify class members in a "'ready' or 'efficient' manner," or "without individualized inquiry." A88-A89. That conclusion was legal error, and is certainly no substitute for factual findings the district court never made—and that could not be sustained on this record, in any event. *Cf. Reyes*, 802 F.3d at 484 ("We cannot just assume the District Court conducted the appropriate analysis under Rule 23.").

**3.** At the second ("belt") level, Plaintiffs proved that PBM data could be programmatically mined to identify class members by identifying administrator transactions and then identifying the administrator's end-payor client from the data. Op. Br. 20-22; 33-34. Plaintiffs proved that PBMs could flag transactions involving administrators because "in those exceptions where you've got an [administrative services only] or [third-party administrator], the PBM knows … which plans those are." A828-A829 (Craft Dep.). In fact, insurance regulations require administrative-only transactions to be tracked separately from insured transactions, so PBM data must allow such tracking. A1009-A1010 (Craft Reply ¶13). PBMs themselves state that their clients include "third-party administrators" and that they can identify their clients. *See, e.g.*, A358 (Express Scripts). As with the end payor's identity, Dietz agreed that PBMs would seek this information, though it "wasn't part of [his] assignment" to evaluate how often they collect it; he disputed only, albeit without

17

any basis, that they would *always* know it. A982 (Dietz Dep.).

Moreover, as Craft explained, programmatic tools can identify administrator transactions. Defendants bemoan a lack of specifics, Resp. Br. 35, but fail to meaningfully respond to the specific filtering techniques that Craft proposed:

- Distinguishing between certain insurance companies' administrative and insured business using distinct carrier codes. Op. Br. 22, A812-A813 (specifying codes), A1012-A1013 (same).

- Using a plan-type field to filter non-employment-related plan types (e.g., Medicare) that are fully-insured by definition and thus do not involve administrators. Op. Br. 41; A265-A266, A1010 (Craft). Defendants claim (Resp. 33 n.10) this won't work because a particular field isn't part of the mandatory NDPCP standards. But the district court rejected this argument for government plans, A83 n.7, and could, and should, have recognized the same plan-type filter for the fully-insured plan exclusion.[5]

- Using name-matching algorithms to match names of known administrators to PBM client data. Op. Br. 34; A892 (Craft describing how name-matching works). Defendants respond (Br. 23) that

---

[5] Defendants cry waiver again here, while acknowledging that this was part of the methodology debated between the experts. *See* Resp. Br. 33 n.10.

matching a company's name doesn't help because an insurance company can play insurer or administrator roles. But that's not true for third-party administrators which, by definition, do not provide insurance. Op. Br. 18 n.6; AIA Br. 16-17 & n.23.

- After administrator transactions have been identified, identifying the end payor from common data patterns for the "carrier," "account," and "group" fields. Op. Br. 21; A1010-1012 (Craft Reply). Defendants respond that there is no intermediary/end payor column in the PBM data, Resp. Br. 34, missing the point that end payors are identified *after* administrator transactions are segregated by PBMs or through one of the above methods. While Defendants, like the district court, dismiss the use of common data patterns as impermissible reliance on what Craft would "normally expect to see" or "eyeballing," Resp. Br. 24, 31, 33; *see* A86 n.8 ("ad hoc"), computerized queries based on typical data structure are far afield from someone combing field-by-field through a spreadsheet.

As with the "overalls" step, Defendants' primary response (Br. 31) is that the district court found these "belt" methods unworkable. Again, the opinion indicates no such analysis. The only filtering techniques the district court considered are the ones it wrongly classified as "ad hoc" or that Craft candidly agreed would not

work—*i.e.*, sorting based on HMO status. A85; *see* Resp. Br. 24, 31.

**4.** At the third level—the "suspenders"—Plaintiffs proposed using affidavits as a backstop. The Court has repeatedly reaffirmed that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." *Hargrove,* 974 F.3d at 470 (quoting *City Select*, 867 F.3d at 441). The use of affidavits here is consistent with *Byrd*, *City Select*, and *Hargrove*, and entirely distinct from the nothing-but-affiant-say-so proposal rejected in *Carrera v. Bayer Corp.*, 727 F.3d 300, 309-11 (3d Cir. 2013).

**a.** The number and scope of potential affidavits fall comfortably within this Court's precedents. The number of affidavits will be limited (*contra* Resp. Br. 38-40) because, as described above, the number of entities presenting questions can be winnowed down through PBMs flagging administrators or via programmatic data analysis. And even if affidavits were needed from every class member, the number would be in the same ballpark as in *City Select*. 867 F.3d at 442.

Defendants reply (Br. 39) that it is the number of *queries* that matters. But the fact that a single insurance company can answer the "payor or not" question for many plans at the same time, *see* Resp. Br. 39, 42, makes the use of affidavits even more feasible, not less. All agree that insurance companies know when they pay for prescription drugs and when their self-funded clients do. *See, e.g.*, A977 (Dietz Dep.). The scope of the inquiry, too, is as "simple [an] exercise," Resp. Br. 44, as in

*Byrd* and *City Select*. It is a single question: are you an administrator or a payor for these transactions? *See* Op. Br. 34. Defendants claim the answer may vary over time, Resp. Br. 43, but no matter; an entity that paid for at least one transaction during the class period is properly identified as a class member. *See City Select*, 867 F.3d at 442 (affidavit would ask whether fax received "on one of the dates in question").

**b.** Affidavits would likewise be equally, if not more, reliable and readily corroborated as in other cases. In *City Select*, it was unclear whether there was any basis for corroborating that a dealership received a fax besides the presence of its fax number in the database, yet the Court was open to use of affidavits. 867 F.3d at 442. In *Byrd*, the plaintiffs had submitted no evidence regarding corroborating address records, but the Court was comfortable assuming that such records existed. 784 F.3d at 170-71. And in *Hargrove*, the corroborating records were incomplete. 974 F.3d at 480.[6]

The corroborating records here are far more robust. The PBM data alone can corroborate a plan's affidavit. And numerous other records exist, including transaction information that everyone agrees administrators track. *See* A977 (Dietz Dep.); A993A-A993B (named Plaintiff's transaction records from an administrative

---

[6] The Court held the gaps against the employer, as Defendants note, Resp. Br. 44-45, but also separately held that the gaps "do not undermine the conclusion that all the evidence taken together could" identify class members. 974 F.3d at 480.

intermediary labeled with their name and "self-funded").[7]

Defendants' argument about affiants' potential confusion fares no better. *See* Resp. Br. 41-43. No named Plaintiff expressed any confusion about whether it was an end payor. One Plaintiff's errant reference to OptumRx (a PBM) as an insurer, A396, does not suggest confusion about whether it is itself an end payor. A397 (Plaintiff answered "Yes, it does" pay for prescriptions). Nor does a form filed for a different purpose, A329, when the representative was quite clear that the plan was not insured, A381. Ultimately, no evidence shows that employers and unions, much less insurance companies, will be confused about whether they paid for certain prescription drugs. Given the PBM data alone, not to mention other records, Defendants will never be forced to "accept as true absent persons' declarations that they are members of the class, without further indicia of reliability." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012).

**c.** As Defendants acknowledge, the affidavit issue was raised in two district court filings. Resp. Br. 37. Because Defendants had the opportunity to file additional responsive briefing, the argument was preserved. Arguments generally must be raised before a reply brief to give the other side a chance to respond. *See Hargrove*, 974 F.3d at 475 n.5 (declining to find forfeiture despite argument being raised in

---

[7] That one named Plaintiff could not produce a copy of a signed version of one type of verification document (only an unsigned version), *see* Resp. Br. 43-44, is hardly dispositive.

footnote because other party had an opportunity to respond). Given the extra briefing allowed by the district court, Defendants had that opportunity here.

Dietz's supplemental opinion raised several new contentions. Plaintiffs were therefore granted leave to file a responsive reply expert report, and the district court also permitted Defendants to file an additional brief. A367. Defendants' response could have addressed the issue of affidavits, but did not. *See, e.g.*, A1032 n.7 (replying to a different argument from a footnote in Plaintiffs' reply brief). The district court was "on notice of the legal argument," too, *Hargrove*, 974 F.3d at 475 n.5, because Plaintiffs elaborated on it when directed by the district court to address the two example transactions. A1074-A1076. There was no forfeiture.

Regardless, "[t]his Court has discretionary power to address issues that have been waived." *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005). Doing so is particularly appropriate in a Rule 23 appeal, where the parties have fully briefed the issue and because Rule 23(c)(1)(C) allows plaintiffs "multiple bites at the apple … to succeed on a renewed motion for certification." *Hargrove*, 974 F.3d at 476.

## C. The Conflict with Other District Court Decisions Confirms the District Court's Errors.

As Defendants do not dispute, no other district court has declined to find a non-consumer end-payor class ascertainable when presented with PBM data and Craft's methodology. *See* Op. Br. 44-47. Defendants cite cases denying certification to end-payor classes, Resp. Br. 53, but those classes all included consumers (now

excluded from the class here) and none of the cases involved Craft's methodology. *See Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2015 U.S. Dist. LEXIS 74846, at *42-43 (E.D. Pa. June 10, 2015) (class included entities and consumers and plaintiffs presented no evidence on methodology); *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 149-50 (E.D. Pa. 2015) (court found ascertainability issues with inclusion of consumers and PBMs); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 569 (E.D. Tenn. 2014) (same).

As for cases finding ascertainability, Defendants insist that other courts were presented with different methodologies. Resp. Br. 50-52. But the methodologies are not meaningfully different. As in *Zetia*, Craft's methodology here pulls from the "plan" and "group" fields, as well as from "carrier" and "account." A256 ("plan" and "group"), A1010 ("carrier," "account," and "group"); *compare In re Zetia Ezetimibe Antitrust Litig.,* No. 2:18-md-2836, 2020 U.S. Dist. LEXIS 183601, at *40 (E.D. Va. Aug. 13, 2020) ("Plan ID" and "Group ID"). As in *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-6549 (CM) (RWL), 2020 U.S. Dist. LEXIS 247078, at *35-37 (S.D.N.Y. Dec. 18, 2020), the methodology also combines "analyzing the raw data," with relying on "the PBM itself … to provide the necessary information." Rather than involving "different" methodologies, other cases simply emphasize different aspects of Craft's approach. As for Defendants' assertion that other courts are simply "uncritical[]," Resp. Br. 51 (citing *In re Ranbaxy Generic*

*Drug Application Antitrust Litig.*, 338 F.R.D. 294 (D. Mass. 2021)), the decisions often reflect identical objections, *see In re Ranbaxy*, 338 F.R.D. at 308 (describing defendants' argument that "there is no single way to search datasets for non-class members such as [administrators]"), and often followed multi-day hearings, sometimes including testimony by Craft and Dietz, *see In re Zetia Ezetimibe Antitrust Litig.,* 2020 U.S. Dist. LEXIS 183601, at *20. Defendants' contention that every district court that has accepted Craft's methodology was asleep at the switch is implausible. And the widespread certification of near-identical types of classes pursuing similar claims belies the concept that such classes are unmanageable, infeasible, or inefficient. *See* AAI Br. at 22-23.

## IV.    THE POLICIES UNDERLYING THE CLASS ACTION PROCEDURE FAVOR ASCERTAINABILITY HERE.

### A.    This Class Poses No Risk to Defendants' Due Process Rights.

Ascertainably serves three purposes: notice and the ability to opt out, defendants' rights to challenge class membership, and maintaining the "efficiencies" of a class action. *City Select*, 867 F.3d at 439. All three rationales support ascertainability here and Defendants make no colorable argument otherwise.

Defendants do not dispute that notice presents no difficulty, and protest only purported impairment of their right to "test the reliability of the evidence submitted to prove class membership," citing the Target and MITRE examples. Resp. Br. 54 (quoting *Carrera*, 727 F.3d at 307). But *Carrera*, a case involving over-the-counter

supplements for which no transaction records existed, explained that the "right to challenge" is at stake only when "unverifiable affidavits" are the only way to identify class members. 727 F.3d at 305, 307. *Carrera* had no corroborating records. *Id.* at 309. Here, Plaintiffs have PBM data, as well as other business records to corroborate affidavits in the rare case that they are needed. The due process "right to challenge" is thus not implicated. *Id*.

> **B.    As (Wrongly) Applied by the District Court, the Ascertainability Doctrine Impermissibly Impedes the Class Mechanism.**

While feigning concern for dilution of class members' recoveries, Resp. Br. 54, Defendants sidestep the negative consequences of the district court's too-exacting ascertainability standards.

As the Court has explained, "the purpose of a Rule 23(b)(3) class [is] to aggregate and vindicate meritorious individual claims in an efficient manner." *Byrd*, 784 F.3d at 171. If, as Defendants repeatedly imply, the number of inquiries alone (however simple or verifiable) can render a class non-ascertainable, *see* Resp. Br. 39-40, 48, then such a rule would "seriously undermine" the class action mechanism. *See Byrd*, 784 F.3d at 171.

So crippling the class action mechanism would thwart the policing of unlawful, anti-competitive conduct in the pharmaceutical context. *See* AAI Br. 24-27. Defendants note that the direct purchasers' class is proceeding, Resp. Br. 55, but that action will not redress the damages suffered by health plans that bear the brunt

of the financial burden for illegally overpriced drugs.

What's more, most class members, including named Plaintiffs, are small health plans whose individual damages are dwarfed by the costs of litigating the case, despite $1 billion in collective damages. *See* Op. Br. 52-53. That situation is precisely when the class action mechanism is most essential. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Yet under the district court's (and Defendants') heightened ascertainability analysis, the more claims at issue, the higher the hurdle for certification. That upside down result cannot be the rule.

Defendants claim that the problem is not class size, but that pharmaceutical data is not rich in the way that matters. Resp. Br. 54. But that is akin to saying that ascertainability bars any class action by pharmaceutical end payors—even though every purchase is documented, tracked, and linked to a particular payor within mere minutes. *See* AIA Br. 18-20. If end payors cannot feasibly be identified here, it is hard to see how they ever could be in any prescription drug case, never mind in any other industry, where the data would almost certainly be less rich.

### C.    Reconsideration of the Court's Ascertainability Standards Is Unnecessary, but Preserved for En Banc Review.

Because the record here amply meets this Court's standards for ascertainability, there is no need to reconsider those standards. Plaintiffs nonetheless preserve their challenge to the Circuit's atextual rule for en banc review if the district court's unwarranted narrowing of that standard is affirmed.

# CONCLUSION

The order denying class certification should be reversed.

April 18, 2022

Kenneth A. Wexler
Justin N. Boley
WEXLER BOLEY & ELGERSMA LLP
55 West Monroe St, Ste 3300
Chicago, IL 60603
Tel.: (312) 346-2222

Michael M. Buchman
MOTLEY RICE
777 Third Avenue, 27th Floor
New York, NY 10017
Tel: (212) 577-0040

Steve D. Shadowen
Richard M. Brunell
HILLIARD SHADOWEN
1135 West 6th St, Ste 125
Austin, TX 78703
Tel.: (202) 600-9640

Respectfully submitted,

s/Hyland Hunt

Hyland Hunt
Ruthanne M. Deutsch
Alexandra P. Mansbach
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Tel.: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Sharon K. Robertson
COHEN MILSTEIN SELLERS
    & TOLL PLLC
88 Pine St, 14th Floor
New York, NY 10005
Tel.: (212) 838-7797

Marvin A. Miller
MILLER LAW LLC
115 South LaSalle St, Ste 2910
Chicago, IL 60603
Tel.: (312) 332-3400

*Attorneys for Appellants*

## COMBINED CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. My name appears on this brief and I am a member of the bar of this Court. *See* L.A.R 46.1.

2. The foregoing brief is in 14-point Times New Roman proportional font and contains 6,477 words, excluding the parts exempted by Fed. R. App. P. 32(f), and thus complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the typestyle requirements of Fed. R. App. P. 32(a)(6), and the type-volume of Fed. R. App. P. 32(a)(7)(B).

3. On April 18, 2022, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

4. The electronic and paper versions of the foregoing brief are identical.

5. This file was scanned with Microsoft Defender Antivirus, version 1.363.567.0, and no virus was detected.

s/Hyland Hunt
Hyland Hunt

April 18, 2022